**Daniel A. MILAN and National Bank of Commerce in New Orleans, Plaintiffs,**

v.

**PROVIDENCE WASHINGTON INSURANCE COMPANY, Defendant.**

**Civ. A. No. 10175, Division D.**

United States District Court
E. D. Louisiana,
New Orleans Division.

March 4, 1964.

---

Sessions, Fishman, Rosenson & Snellings, Cicero C. Sessions, William P. Rutledge, New Orleans, La., for plaintiffs and third-party defendant, Fidelity & Guaranty Insurance Underwriters, Inc.

Deutsch, Kerrigan & Stiles, Frank J. Peragine, New Orleans, La., for defendant.

AINSWORTH, District Judge.

This is a suit by Daniel A. Milan and The National Bank of Commerce in New Orleans to recover the sum of $15,556.83 (plus penalties and attorney's fees) under an insurance policy issued to Milan in the sum of $75,000 by Providence Washington Insurance Company, with loss-payable clause to mortgagee bank. The policy provides coverage for certain perils, including windstorm, on a building known as the Kenner, Louisiana Post Office Building near New Orleans.

By third-party action Providence asserted a claim against Fidelity & Guaranty Insurance Underwriters, Inc. on its policy of insurance in the sum of $65,000 issued to Quality Construction Company, Inc., also providing windstorm coverage on the same building.

On May 11, 1959, at approximately 6:00 p. m., the roof of the insured post office collapsed, resulting in damage to the building in the amount of $15,556.83.

On October 27, 1958, a written agreement was entered into between Milan and Quality under which Quality agreed to take title to certain real property (on which it had previously acquired options); to construct a building thereon; to obtain a construction loan from the National Bank of Commerce in New Orleans secured by collateral mortgage; to convey the property to Milan subject to the mortgage and the United States Government's lease; Milan to receive the rental payments. In exchange for the building and property, the agreement set forth that Milan "conveys and transfers herewith to Quality his one hundred and ten shares of stock in Quality, which

transfer is evidenced by his endorsement of the abovementioned stock certificate and the delivery thereof this date to Quality." (However, it was conceded that the actual delivery of the stock did not occur until formal record title was conveyed.) On December 22, 1958, Quality took formal title to the property. Thereafter, on May 1, 1959, the building, now complete, was formally accepted by the Post Office Department and the rentals to Milan began. Providence's policy was issued to Milan, countersigned on April 29, 1959, and bearing an effective date of May 1, 1959, with loss-payable clause to the bank. On May 7, 1959, Quality executed a mortgage, represented by Quality's note, and an assignment of the rent on the building to the bank, pursuant to the provisions of the contract between Quality and Milan. A severe weather disturbance occurred on May 11, 1959. The roof of the post office building collapsed resulting in substantial damage, for which recovery is sought by this suit. Milan made proof of loss to his insurer, Providence, in the amount of $15,686.26 but Providence refused payment, denying all liability. Milan finally took formal legal title to the property on September 23, 1959. On the same day Quality made proof of loss to its insurer, F & G, for the sum of $7,222.81 (representing 65/140 of the total damage to the building) which was thereupon paid.

There are three principal issues to be resolved: Was the damage to the building caused by windstorm; if so, should Providence or F & G or both bear the loss; if both should pay the loss, how should it be apportioned?

The evidence convincingly shows that there was a windstorm in the area of the building on the evening in question. The damage occurred at a time when severe gusts of wind were reported. Official records at nearby Moisant Airport (approximately 1 mile away) and the north and south bascules of the Causeway (approximately 8 miles away) showed wind velocities ranging from 23 to 62 miles per hour, with gusts of even greater force. There was substantial property damage throughout the City of New Orleans and the surrounding areas, such as broken plate glass windows, fallen trees and other destruction.

■ High winds were accompanied by heavy rain. Providence attempted to prove by expert testimony that the weight of an accumulation of rain superimposed on the concave surface of the roof of the building caused its collapse, because of alleged structural defects in the main beam supporting the roof. The expert testimony produced by plaintiffs and defendant, considered with the evidence introduced, permits no conclusion other than that there was a windstorm which was the proximate and efficient cause of the damage. The testimony of an eyewitness, a post office employee, to the collapse of the roof was most convincing. He testified that he was sorting mail in the building when he heard a noise overhead, that he looked up and saw the ceiling move. Suddenly, the doors were flung open and the force of the wind hurled him from 10 to 12 feet through the back doorway. He looked back and saw the destruction to the roof and the building.

■ In order to recover under a windstorm policy, it is not necessary that the windstorm be the sole cause of the damage. That a structural defect in the building may have been a contributing factor is immaterial. If the damage would not have occurred in the absence of a windstorm, the loss is covered by the policy.[1]

The policy of defendant, Providence Washington Insurance Company, issued to Milan, shows on its face its terms of coverage, i. e., May 1, 1959 to May 1, 1964. The windstorm damage occurred on May 11, 1959.

1. Roach-Strayhan-Holland Post No. 20, American Legion Club, Inc. v. Continental Ins. Co., 237 La. 973, 112 So.2d 680 (1959); Bogalusa Gin & Warehouse v. Western Assur. Co., 199 La. 715, 6 So.2d 740 (1942).

Defendant contends that Milan had no insurable interest, not having formal record title to the property on the date of the casualty and not having actually transferred his shares of Quality stock to Quality at the time of the agreement; furthermore, that the policy of insurance although complete on its face was intended by oral agreement of the parties to take effect only when Milan should acquire record title. The evidence offered by defendant to show the intent of the parties was indefinite and inconclusive; the witnesses' recollections as to pertinent conversations and oral agreements occurring several years ago were inconsistent and vague. Defendant has, therefore, failed in its burden of proof in this respect.

By the agreement of October 27, 1958, Milan, in exchange for his stock interest, had agreed to accept title to the building although admittedly the actual record title was not conveyed until September 23, 1959. Defendant's argument is that Milan, in the absence of legal title to the property at the time of the damage, had no economic interest therein, that the risk of loss was still on the then record title owner, Quality, and therefore that Milan had no insurable interest.

LSA–R.S. 22:614, subd. B provides that:

"  'Insurable interest' as used in this Section means any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage."

The statute does not require ownership of the property as an element of an "insurable interest."

"It is well settled that any person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss, regardless of whether he has or has not title in, or lien upon, or possession of the property itself." Harrison v. Fortlage, 161 U.S. 57, 16 S.Ct. 488, 40 L.Ed. 616 (1896).[2]

The text writers on insurance law give a very broad interpretation of the term "insurable interest":

"The usual rule customarily followed is that an insurable interest exists when the insured derives pecuniary benefit or advantage by the preservation or continued existence of the property or will sustain pecuniary loss from its destruction. Reasonable expectation of benefit from preservation of the property is thus sufficient; or liability to loss from damage to it will be sufficient. A right of property is not an essential ingredient of insurable interest; any limited or qualified interest, whether legal or equitable, or any expectancy of advantage, is sufficient. It does not matter in what way such benefit arises or the reason loss would occur thereby, limited presumably by dictates of public policy—if such benefit would be lost by a destruction of the subject matter, that interest is insurable." Appleman, Insurance Law and Practice, Vol. 4, § 2123.

"A person has an insurable interest in property when he owns the freehold; an estate less than a freehold; an undefined fractional share of the freehold; any interest in the property cognizable in law or equity; is the owner of the equitable title; or is the owner of the record title. Different parties procure insurance of their several interests, or one having distinct interests may insure both." Couch on Insurance 2d, Vol. 3, § 24:14.

"The holder of an option has an insurable interest in the property to which the option extends." Couch, supra, § 24:103.

Milan, by his agreement to transfer his stock to Quality, in consideration of

---

2. See also Knighten v. North British and Mercantile Ins. Co., 238 La. 767, 116 So. 2d 516 (1959); Welch v. New York Underwriters Insurance Co., La.App., 3 Cir., 145 So.2d 376 (1962).

obtaining title to the post office property, divested himself of an important right in order to obtain ownership of the building. Despite the fact that no cash was involved in the transaction and the stock was not actually transferred at the time thereof, the agreement was a valid one, and Milan actually relinquished all rights of control and participation in the Quality corporation, in exchange for which he obtained a real economic and equitable interest in the building.

In support of its argument that legal ownership is a prerequisite to an insurable interest, defendant cites Union Cent. Life Ins. Co. v. Harp, 203 La. 806, 14 So. 2d 643 (1943), in which the court suggested that even in the situation where under an executory contract of sale, a prospective purchaser takes possession of the property, it is the vendor who has the insurable interest "by virtue of his legal title and the equitable lien which he holds as security for the purchase price." This case, however, involved a dispute between a vendor and vendee, each of whom had reimbursed the mortgagee of the property, the assured, premiums paid by it under the policy issued on the premises owned by them jointly. Subsequently, the vendor sold her interest in the property to the vendee who became the owner of the entire interest in a residence later destroyed by fire. The claim of the vendor for one half of the proceeds of the policy (deposited by the mortgagee in an interpleader action) was denied, the court holding that having previously divested herself of her interest in the property she consequently had no interest in the proceeds of the policy.

The case is distinguishable from the instant case, in that here there were two separate insurable interests, each interest insured by a separate insurance company.

■ The authorities uniformly hold that there may be several distinct interests which may be insured, and that an interest may exist in several people at the same time.[3] We are aware of no Louisiana case to the contrary, and certainly the Louisiana statute relating to insurable interest on property imposes no limitation on multiple interests.

■ Both contracts of insurance were in effect on the date of the loss.[4] The policies here are contracts of indemnity to compensate for loss and not for the purpose of allowing profit; therefore, the total collectible thereon is the amount of the actual damage or the sum of $15,556.83. The general rule of law which is sanctioned in equity is that where there is a loss contribution should be exacted and the loss prorated between the insurers. Each insurer should be required to contribute ratably. In order to apply the applicable principles in an equitable manner, there will be judgment therefore in favor of plaintiff against defendant, Providence, in the sum of $15,556.83, and judgment also in favor of third-party plaintiff, Providence, over and against third-party defendant, F & G, for 65/140 of the loss, or the sum of $7,222.81. We do not believe that the circumstances here warrant our allowing the claim for penalties and attorney's fees, which are accordingly denied.

Judgment will be entered accordingly.

3. 44 C.J.S. Insurance § 180, p. 878; Appleman, Insurance Law and Practice, Vol. 4, § 2124; Couch on Insurance 2d, Vol. 3, § 24:14.

4. Both policies contain the following identical clause: "This Company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not." Defendant contends that the clause applies here. Plaintiffs contend that the clause does not apply but they concede that under the general law relating to contribution the end result would be that Providence should be held liable for $75/140$ and F & G for $65/140$ of the loss, which is the ratio which the face amount of each of the two policies bear to each other. The effect, therefore, is the same as far as apportioning the loss is concerned.