FAJARDO SHOPPING CENTER, S.E.,
A New Jersey Partnership,
Plaintiff, Appellee,

v.

SUN ALLIANCE INSURANCE COMPA-
NY OF PUERTO RICO, INC., Subsid-
iary of Alliance Assurance Company
Limited, Defendant, Appellant.

No. 98–1649.

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 1998.

Decided Feb. 3, 1999.

Luis A. González, with whom L.A. González Law Offices, P.A. was on brief, for appellant.

Edward M. Borges, with whom David Rivé–Power and O'Neill & Borges were on brief, for appellee.

Before TORRUELLA, Chief Judge, HALL,* Senior Circuit Judge, and LYNCH, Circuit Judge.

* Of the Ninth Circuit, sitting by designation.

TORRUELLA, Chief Judge.

Plaintiff Fajardo Shopping Center, S.E. ("FSC") filed this action against Defendant Sun Alliance Insurance Company of Puerto Rico, Inc. ("SAIC") to recover insurance policy benefits in connection with damage to commercial leasehold property allegedly sustained during Hurricane Hugo. After approximately five years of discovery, the district court granted summary judgment in favor of FSC on the issues of liability and damages and ordered SAIC to pay FSC $1,301,856.77. The district judge also awarded FSC prejudgment interest in the amount of $868,826.60 plus attorneys' fees. SAIC appeals both the district court's grant of summary judgment and its award of prejudgment interest and attorneys' fees.

## I. BACKGROUND

The Fajardo Shopping Center ("Shopping Center" or "FSC") is a three-building structure located in the northeastern municipality of Fajardo, Puerto Rico. For the past twelve years, it has been owned by an entity known as the Fajardo Partnership, a partnership organized under the laws of the state of New Jersey. Its principal building, Building I, is an L-shaped structure, units of which are leased to more than a dozen retail merchants, including Pueblo Supermarkets, its main tenant. The remaining two structures, Buildings II and III, have throughout the relevant time period been rented to a Firestone and a Kentucky Fried Chicken franchise, respectively.

On December 19, 1988, the Fajardo Partnership obtained a special multi-peril insurance policy from SAIC for the period of December 19, 1988 through April 22, 1991. (See J.A. at 778). The policy insured the Shopping Center against "all risks of direct physical loss subject to the provisions and stipulations herein and in the policy of which this form is made a part." (Id. at 785). The policy also insured against the loss of rents by the Fajardo Partnership caused by a covered risk. (See id. at 779). One of the pertinent exclusions included in the policy excepted from coverage losses caused by "faulty design, specifications, workmanship, construction, or materials if a peril excluded by this policy contributed to the loss at any time." (Id. at 786).[1] None of the provisions or stipulations made a part of the policy excluded losses caused by a hurricane or windstorm.[2]

On September 18, 1989, Hurricane Hugo struck the island of Puerto Rico. At maximum sustained winds of 125 miles per hour, the western part of Hurricane Hugo's eyewall passed directly through the municipalities of Ceiba, Fajardo and Luquillo. The intense winds did not, however, translate into unusually heavy rainstorms. San Juan reported only 1.4 inches of rain while Fajardo reported approximately 6.25 inches.[3]

During Hurricane Hugo, the FSC property suffered extensive damages. Specifically, structural double-tee beams ("DT beams") supporting the roof of the Shopping Center deflected, losing their structural integrity. As a result of this deflection, portions of the FSC roof collapsed. Other portions of the roof, although not collapsed, were rendered structurally unsound and posed a risk of collapse.

1. In the proceedings below, SAIC at various times argued that other exclusions also applied to preclude recovery under the policy. However, because SAIC based its argument in opposition to summary judgment on the above-mentioned exclusion, we will not address the applicability of other exclusions.

2. Nor does the policy anywhere list windstorm or hurricane as a peril excluded by the policy. Thus, we note that even if a structure suffered from "faulty design, construction or workmanship," if a hurricane or windstorm—perils not excluded by the policy—contributed to the loss, the above-mentioned exclusion would not apply and the damage would be covered.

3. To put this data in perspective, as much as 22.2 inches of rainfall were recorded in Puerto Rico during Hurricane Hortense. The National Oceanic and Atmospheric Administration ("NOAA") attributed the relatively modest rainfall during Hurricane Hugo to the rapid forward movement of the hurricane which greatly reduced its maximum potential rainfall. See National Weather Service, NOAA, U.S. Dep't of Commerce, National Disaster Survey Report, Hurricane Hugo, Sept. 10–22, 1989, (1990) (hereinafter "NOAA Survey").

Upon plaintiff's request, SAIC advanced FSC $150,000 to cover emergency repairs and to prevent further damage to the Shopping Center property. Shortly thereafter, FSC engaged an engineering firm, Izquierdo, Rueda & Associates ("IR & A"), to prepare an estimate of damages. The firm concluded that approximately 75,000 square feet of roof would have to be replaced because of structural damage. IR & A estimated the total cost of repairs to be $1,496,218. In early 1991, FSC submitted the firm's report and estimate to SAIC.

On May 7, 1991, a meeting was held at the SAIC offices to discuss FSC's claim. SAIC followed up the meeting with a letter to FSC dated July 1, 1991. In its letter, SAIC requested additional information and permission to carry out inspections of the property. The letter also stated that, despite its advance of $150,000, SAIC was reserving all of its rights under the policy because it had concluded that most of the damage to the roof was caused by preexisting structural defects in the DT beams, and not by Hurricane Hugo.

In a subsequent letter dated August 19, 1991, SAIC informed FSC of the results of an inspection of the FSC property performed by its engineer, Emiliano Ruiz ("Ruiz"). According to Ruiz, the deflections of the DT beams were not caused by windstorm but rather by the ponding of water due to a faulty and inadequate drainage system. SAIC further stated that such water ponding, "plus other factors such as inherent or latent defect of the beams ... construction and design deficiencies, and the fact that the building was not built according to the best engineering practices indicate that the damages claimed ... are excluded under Part VIII, Items 2 and 4C of the above policy." (J.A. at 2797).[4] As a result, SAIC agreed to pay exclusively for: (1) the removal and replacement of built-up roofing and hung ceiling; (2) the removal of debris and clean-up; (3) repair to air conditioning and electrical systems; and, (4) the replacement of store front glass, flashings, paint work, and parking illumination. SAIC calculated its liability under the policy to be $96,584.46, after subtracting the advanced amount ($150,000), the coinsurance penalty ($127,292), and the deductible ($3,000). SAIC submitted this amount to FSC as a proposed proof of loss.

Upon examining SAIC's proposal, FSC conducted further investigations to prove that the damages suffered resulted from the hurricane and not from inherent or latent design defects. FSC's investigation included: (1) a survey of the damage performed by Sousa Surveying Services; (2) an opinion as to the cause of the damage from structural expert José M. Izquierdo ("Izquierdo"); (3) an accountant's report prepared by CPA Rafael Pérez–Villarini ("Pérez–Villarini") detailing the amount of rent lost; and (4) a second cost estimate rendered by the late Engineer José Carbia. As a result of this investigation, FSC submitted its own proof of loss to SAIC on October 27, 1992, claiming damages in the amount of $1,944,356.73. SAIC promptly rejected FSC's proof of loss, reasserted its theory of causation, and resubmitted its previous offer of $96,584.46. Shortly thereafter, FSC filed the instant action.[5]

4. FSC's version of the policy, as delivered to FSC, was different from the policy relied upon by SAIC in its August 19, 1991 letter. It was later determined that the exclusion clause relied upon by SAIC was Section VI, Item 9 of the FSC policy, which states:

This policy does not insure under this form against:

. . . . .

9. faulty design, specifications, workmanship, construction, or materials if a peril excluded by this policy contributes to the loss at any time.

5. FSC has since conducted more thorough investigations concerning the cause of the deflections. In 1996, FSC retained another structural engineer, Mr. Siddiq Khan ("Khan"), to inspect the roof, recommend repair solutions, and issue a second cost estimate. Khan's investigation included a review of the original architectural and structural drawings to determine whether there was a deficiency in the original structural design. Khan concluded that the original structural design was adequate and that the building was constructed in accordance with the then applicable construction standards. Khan also concluded, consistent with FSC's previous experts, that Hurricane Hugo's rainfall and strong winds caused the damages to the FSC property.

## II. THE APPOINTMENT OF A SPE-CIAL MASTER

On July 5, 1995, FSC moved for a jury trial. SAIC opposed the motion on the ground that the case was "extremely technical in nature and involve[d] construction issues . . . which are beyond the knowledge of the common citizen." (J.A. at 135–36). In response, the court scheduled a conference for December 11, 1995, to address the issues raised by the parties and to explore settlement possibilities. After hearing arguments from both parties, the court denied FSC's motion for a jury trial. In addition, the court determined that "the appointment of a [Special] Master [would] be appropriate in this case." (Mins. of 12/11/95 Proceedings).[6] The court granted the parties until January 15, 1996 to submit three candidates for appointment as special master.

On March 18, 1996, FSC informed the court that, of all the candidates it contacted, only one—Engineer Efrahim Murati–Martínez ("Murati")—was willing to serve as a special master in an adversarial proceeding. SAIC never objected to FSC's motion proposing Murati's appointment. Nor did SAIC submit names of candidates for special master. Therefore, after considering his qualifications, the court appointed Murati to serve as special master.

Pursuant to Rule 53(c), the court's order of appointment enumerated Murati's rights, powers, and responsibilities as special master. Specifically, the court's order granted the special master "all the rights, powers, and duties as provided for a master under Rule 53 of the Federal Rules of Civil Procedure." (J.A. at 158).[7] On June 5, 1996, Murati accepted his appointment. The very next day, SAIC submitted—for the first time—its proposed candidate for special master. In its Motion Requesting Appointment of Special Master, SAIC never objected to the court's power to appoint a master. Nor did SAIC object to Murati's actual mandate. Rather, the essence of SAIC's objection was that Murati did not have sufficient formal training in structural problems to act as master in this case. (*See id.* at 162). In its order denying SAIC's motion, the court addressed this issue by stating: "Special Master Murati will remain as Master in this case. His performance so far belies any claims by defendant as to his suitability for the post." (*Id.* at 169).

SAIC now argues on appeal that the district court's appointment of a special master in this case violated Fed.R.Civ.P. 53 and Article III of the United States Constitution. Because we conclude that SAIC's failure to object to the district court's appointment of a special master amounts to consent, we do not reach the merits of this claim.

## III. DISCUSSION

### A. THE SPECIAL MASTER

 As this court has recognized, "parties to a civil case may consent to the appointment of a master under any circumstances." *See Stauble v. Warrob,* 977 F.2d 690, 694 (1st Cir.1992); *see also Peretz v. United States,* 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) ("litigants may waive their personal right to have an Article III judge preside over a civil trial"); *Goldstein v. Kelleher,* 728 F.2d 32, 35 (1st Cir. 1984) ("insofar as Article III protects individual litigants, those protections can be waived"). Even if SAIC did not explicitly consent to the appointment of a special mas-

---

6. The court's authority to appoint a special master derives from Fed.R.Civ.P. 53 which states:

 The court in which any action is pending may appoint a special master therein. . . . A reference to a master shall be the exception and not the rule . . . . in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it. Fed.R.Civ.P. 53(a) & (b).

7. Fed.R.Civ.P. 53(c) states:

 The order of reference to the master may specify or limit the master's powers and may direct the master to report only upon particular issues or to do or perform particular acts or to receive and report evidence only. . . . Subject to the specifications and limitations stated in the order, the master has and shall exercise the power to regulate all proceedings in every hearing before the master and to do all acts and take all measures necessary or proper for the efficient performance of the master's duties under the order. Fed.R.Civ.P. 53(c).

ter, failure to make a timely objection amounts to consent.

A party who desires to contest the propriety of a reference to a master under Rule 53 should move the trial court for revocation of the reference. Inaction in this regard is tantamount to acquiescence and the reference cannot be challenged later on appeal.

9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* Civil 2d § 2605 (2d ed.1994); *see also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1410 (9th Cir.1990) ("[A]n objection to the appointment of a special master must be made at the time of the appointment or within a reasonable time thereafter or the party's objection is waived."); *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 (9th Cir.1989) (party "waived any objections it had to the appointment of a master by failing to raise the issue, or moving to have the reference revoked"); *Charles A. Wright, Inc. v. F.D. Rich Co.*, 354 F.2d 710, 714 (1st Cir.1966) ("Both parties consented to the court's order of reference to the master and . . . plaintiff cannot now object to the order of reference.").

Not only did SAIC not make a timely objection, SAIC never made any objection at all to the district court's power to appoint a special master in this case.[8] Indeed, the district court's decision to appoint a master appears to have at least in part resulted from SAIC's opposition to FSC's Motion for Jury Trial on the ground that the issues involved were "beyond the knowledge of the common citizen." (J.A. at 135–36). SAIC even proposed its own candidate to serve as master. Such conduct does not amount to a timely objection to an order of reference.

Because SAIC consented to the appointment of a special master and to the district court's order of reference, SAIC cannot now object. Moreover, SAIC waived any objection it may have had by not presenting it to the district court when the district court first raised the idea of appointing a special master. We do not hear arguments which were not raised with the district court. *See United States v. Bongiorno*, 106 F.3d 1027, 1034 (1st Cir.1997) (matters not squarely presented below generally cannot be advanced on appeal); *Daigle v. Maine Medical Center, Inc.*, 14 F.3d 684, 687 (1st Cir.1994) ("Our law is clear that a party ordinarily may not raise on appeal issues that were not seasonably advanced (and hence, preserved) below."); *United States v. Slade*, 980 F.2d 27, 30 (1st Cir.1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals."). Accordingly, we decline to reach the merits of SAIC's special master claims.

## B. SUMMARY JUDGMENT

### 1. SAIC's Liability

The question presented by this lawsuit is whether the damage suffered by the Shopping Center was caused by the forces of Hurricane Hugo (a covered peril) or by the faulty design and structure of the DT beams and the Shopping Center roof (excluded perils).[9] Concluding that no genuine issues of material fact existed as to the cause of the damage to the Shopping Center, the district court granted summary judgment on the issue of liability in favor of FSC. SAIC appeals. We review the district court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to the nonmovant, defendant SAIC. *See Dominique v. Weld*, 73 F.3d 1156, 1158 (1st Cir.1996).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

---

8. Although SAIC repeatedly objected to the appointment of Murati as special master and to his conduct throughout the proceedings, SAIC never challenged the propriety of the district court's appointment of a special master in general.

9. As discussed *supra*, at note 2, even if the DT beams and the design of the roof were proved defective, if the hurricane contributed to FSC's loss, the damage would still be covered under the terms of the policy. However, SAIC continues to argue for the applicability of this "faulty design" exclusion.

56(c). In this context, an issue is "genuine" if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party and a "material" fact is one that might affect the outcome of the suit under governing law. *See Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993).

On issues where the nonmovant bears the burden of proof at trial, he may not defeat a motion for summary judgment by relying upon evidence that is "merely colorable" or "not significantly probative." *Id.* (internal quotations and citations omitted). Instead, the nonmovant must present "definite, competent evidence" to rebut the motion. *Id.* (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991)). Summary judgment will be properly entered against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### a. Applicable Law

Both parties concede that Puerto Rican law governs the instant insurance contract dispute. Nevertheless, the Puerto Rico Supreme Court has recently established that since most of the insurance contracts sold in Puerto Rico are modeled after contracts drafted in the United States, both federal and state law principles are useful and persuasive. *See Quiñones López v. Manzano Pozas*, 96 J.T.S. 95, at 1307, P.R. Offic. Trans. No. RE–91–567, slip op. at 11–12, 1996 WL 499244 (P.R. June 25, 1996). We thus expand our analysis beyond Puerto Rican civil law principles.

■ Under an all-risk insurance policy, the insured has the burden of establishing a prima facie case for recovery by proving the existence of the all-risk policy and the loss of the covered property. *See Jomark Textiles, Inc. v. Int'l Fire & Marine Ins. Co.*, 771 F.Supp. 577, 578–79 (S.D.N.Y.1989) (quotations omitted). Once the insured has estab-

lished a prima facie case, the burden shifts to the insurer to prove that the claimed loss is excluded from coverage under the policy. *See id.* (quotations omitted).

■ In the instant case, SAIC admitted that the applicable exclusion clause was Section VI, Item 9, which excepts from coverage losses caused by "faulty design, specifications, workmanship, construction, or materials if a peril excluded by this policy contributed to the loss at any time." (J.A. at 786). Thus, to avoid entry of summary judgment against it, SAIC bears the burden of making "a showing sufficient to establish," *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548, that the damage to the FSC property was caused by "faulty design, specifications, workmanship, and construction"—damage excluded from coverage under the policy. *See Jomark*, 771 F.Supp. at 578–79.[10] More specifically, in order to avoid liability under the policy, SAIC ultimately must prove that the defective design of the DT beams and the FSC roof—not Hurricane Hugo—was the proximate cause of the damage to the Shopping Center. *See id.* Moreover, under Puerto Rico law, insurance contracts, by virtue of being considered adhesion contracts, are liberally construed in favor of the insured. *Quiñones López*, 96 J.T.S. 95, at 1306, P.R. Offic. Trans. No. RE–91–567, slip op. at 10, 1996 WL 499244 (P.R. June 25, 1996) (quotations omitted). Likewise, exclusion clauses—not usually favored in an insurance contract—should be strictly construed against the insurer. *See id.*

■ To determine whether a particular risk was the proximate cause of the damage suffered, one must examine whether the resulting damage was to be expected within the ordinary course of events. *See Cárdenas Maxan v. Rodríguez*, 90 J.T.S. 36, at 7559, P.R. Offic. Trans. No. RE–88–223, slip op. at 6 (P.R. Mar. 9, 1990); *Arroyo López v. Comm. of Puerto Rico*, 90 J.T.S. 101, at 7937, P.R. Offic. rans. No. RE–88–379, slip op. at 8 (P.R. June 29, 1990). In cases where concurrent causes are alleged to have caused the

10. Again, we note that according to our reading of the exclusion language, SAIC also bore the burden of proving that the hurricane—a peril not excluded from coverage—did not contribute to

the damage at any time. *See supra*, n. 2. SAIC has failed to prove this essential element of its case.

damage, we must determine which cause is the most "efficient" one. *See Valle v. American Int'l Insurance Co.*, 108 D.P.R. 692, 697–98, 1979 WL 59104 (P.R.1979); *see also Allstate Ins. Co. v. Smith*, 929 F.2d 447, 451 (9th Cir.1991) ("In determining whether a loss is within an exception in a policy, where there is a concurrence of different causes, the efficient cause—the one that sets others in motion—is the cause to which the loss is to be attributed . . . .") (quoting *Sabella v. Wisler*, 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889 (Cal.1963) (internal quotations and citations omitted)).

Applying this analysis to windstorm insurance cases, most courts have agreed that wind need not be the only cause of a loss for it to be considered the proximate or efficient cause.[11] In order to recover under windstorm insurance coverage, "it is sufficient to show that wind was the proximate or efficient cause of loss or damage notwithstanding other factors contributed to the loss." *Kemp v. American Universal Ins. Co.*, 391 F.2d 533, 534–35 (5th Cir.1968). For example, in *Milan v. Providence Washington Ins. Co.*, the district court concluded that alleged structural defects in a building were immaterial to the issue of liability under a windstorm insurance policy. The court reiterated that "[i]n order to recover . . . it is not necessary that windstorm be the sole cause of the damage. . . . If the damage would not have occurred in the absence of a windstorm, the loss is covered by the policy." 227 F.Supp. 251, 253 (E.D.La.1964). One court has even gone so far as to hold that "where a policy expressly insures against direct loss and damage by one element but excludes loss or damage by another element, the coverage extends to the loss even though the excluded element is a contributory cause." *General*

Am. Transp. Corp. v. Sun Ins. Office, Ltd., 369 F.2d 906, 908 (6th Cir.1966).

### b. The Evidence

■ FSC maintains that downburst forces accompanying Hurricane Hugo proximately caused the damage to the Shopping Center. FSC further maintains that the damage could not have been caused by faulty design or structural defects. FSC's basic argument is: but for the hurricane, no damage would have resulted.

In support of this contention, FSC offers the expert testimony of its structural experts Izquierdo and Khan. Both Izquierdo and Khan specifically concluded that the Shopping Center was properly constructed. (*See* Izquierdo Dep. at 51; J.A. at 2417; Khan 7/17/96 Dep. at 119). Khan further concluded, after conducting extensive testing on the DT beams, that the original design of all of the DT beams met the design and deflection criteria required by the Puerto Rico Building Code applicable at the time of construction. (*See* J.A. at 2417). Both experts concluded that faulty design and construction could not have caused the deflections existing after Hurricane Hugo.

In support of its theory that Hurricane Hugo was the proximate cause of the damage to the FSC property, FSC points to the fact that all of the experts—including SAIC's own expert Emiliano Ruiz—agree that there was a danger of collapse after Hugo that did not exist prior thereto. (*See* Ruiz Dep. at 93; Izquierdo Dep. at 102; Khan 7/17/96 Dep. at 119, 147). FSC further points to the deposition testimony of meteorologist Edwin Núñez who concluded that because conditions favorable for microbursts existed over Fajardo, it is quite possible that a microburst did in fact occur in the FSC area. (*See* J.A. at 2846).[12]

---

11. *See* Stephen M. Brent, *What constitutes "direct loss" under windstorm insurance coverage*, 65 A.L.R.3d 1128, 1975 WL 37158 (1975). Brent states:

> It seems to be universally agreed that the wind need not be the only cause of the loss for it to be said that the loss was a direct result of windstorm. It has been held in many cases that the phrase "direct loss" requires only that the windstorm be the proximate cause of the loss, or the proximate or immediate cause, or the proximate and efficient cause.

Brent, *supra*, at 2(a).

12. A downburst is defined as a strong downdraft which induces an outburst of damaging winds on or near the ground. Downbursts are subdivided into macrobursts and microbursts. Macrobursts have scales larger than four kilometers and cause tornado-like damage. Damaging winds can last from five to thirty minutes and generate horizontal winds of up to 134 mph. Microbursts have scales below four kilometers and can generate

Núñez also concluded that—whether characterized by a microburst or flow separation and turbulence—the "severe conditions, as the hurricane's eyewall passed over the Fajardo Shopping Center, very likely produced the collapse of its roof." (J.A. at 2851). As proof that such wind damage is possible, FSC makes reference to the most recent revisions to the ASCE–ANSI Building Code, which confirm that hurricanes have downburst forces capable of causing damage like that suffered by FSC.[13]

In order to rule out the possibility that water ponding due to faulty design caused the damage to the roof, FSC points to the fact that the Shopping Center roof had never undergone such severe deflections in the twenty years prior to Hugo—even during times of much more intense rainfall. (See Izquierdo Dep. at 91). As SAIC points out, Izquierdo conceded that the Shopping Center roof may have been compromised before Hugo, but Izquierdo also testified that every structure designed, is designed to suffer deflections "because no structure whatsoever, or nobody can attain [sic][a structure] without deflection." (Izquierdo Dep. at 102). Izquierdo further testified that even if the FSC roof had deflected prior to Hugo, the structure "had been inspected [before Hugo] by the insurers, the structure had been inspected and had been accepted as a good structure." (Izquierdo Dep. at 104). Most importantly, the structural analysis of FSC expert Siddiq Khan demonstrated that it was "physically impossible" for water ponding alone to have caused the damage to the FSC roof because the height of water necessary to cause the amount of deflection that occurred was higher than the elevation of the DT beams. (See J.A. at 2411–12, 2429, Appendix VIII at 2627; Khan 7/16/96 Dep. at 51–52, 75). In other words, it would be physically impossible to place on the roof the amount of water necessary to cause the deflections that resulted because the water would spill over the sides of the roof before reaching the necessary depth. (See Khan 7/16/96 Dep. at 51–52, 75–76).

To rebut this evidence and meet its own burden of proving that faulty design and construction was the proximate cause of the damage to the FSC roof, SAIC points to the "overwhelming evidence" in the record that the FSC building suffered inherent structural defects. SAIC's "overwhelming evidence" consists of a letter written by Engineer Alfonso Vick ("Vick") in 1974 in which reference is made to a deflection of up to 14 inches in the DT beams due to water ponding. Unfortunately for SAIC, the Vick letter is inadmissible hearsay, and, as a result, may not be considered on summary judgment. See Vázquez v. López–Rosario, 134 F.3d 28, 33 (1st Cir.1998) ("Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment.").[14]

As further evidence of the Shopping Center's preexisting structural defects, SAIC points to Engineer David McCloskey's ("McCloskey") 1980 inspection report of the FSC property.[15] According to McCloskey's visual inspection of the FSC property, there was "excessive ponding" over Pueblo and "some ponding" over Walgreens. (See Letter from McCloskey to Edward Kildare of 4/14/80, at 1). SAIC maintains that these observations, made by a "totally independent" structural engineer, prove that the FSC property was structurally defective. However, we agree with the district court that SAIC has grossly mischaracterized McCloskey's conclusions. In fact, McCloskey's report concludes that "in general the structures are in good condition" and that "[t]he only immediate repair required is the

---

damaging horizontal winds of up to 168 mph. (See J.A. at 2845).

13. The ASCE–ANSI refers to the American Society of Civil Engineers–American National Standards Institute.

14. Even if the Vick letter was admissible, we do not agree with SAIC that this letter clearly demonstrates that the FSC building suffered from inherent structural defects. Vick ultimately concludes that "the double tees … even now are just as strong as ever…." (J.A. at 823). Vick further clarified that he did not believe the deflections posed any risk to human life. (See id.).

15. Engineer McCloskey was retained by Pueblo Supermarkets in 1980 to inspect the property because Pueblo was contemplating purchasing the property.

roof of the Pueblo Store Expansion." (Letter from McCloskey to Edward Kildare of 5/21/80, at 3). McCloskey further explains that DT beams "typically continue to deflect over the years causing portions of the roofs which were ridges to become valleys, and vice versa. Therefore, roof drains end up at the high points of the roof which leads to ponding." (*Id.* at 1). To address this "fairly common" phenomenon, McCloskey suggested the installation of additional roof drains to the new low points of the roof. (*See id.* at 1). As SAIC's own evidence demonstrates, FSC constantly monitored this situation by installing additional drains in the roof of the Shopping Center.[16] More importantly, when asked in his deposition whether the roof was structurally sound as built and designed, Engineer McCloskey answered in the affirmative. (*See* McCloskey Dep. at 51). In sum, McCloskey's report in no way supports SAIC's contention that the Shopping Center had preexisting structural or construction defects.

In addition, SAIC maintains that FSC's own expert, Engineer Izquierdo, admitted that DT beams "have had a considerable amount of quality control problems [in Puerto Rico], which is why they are rarely used anymore in this jurisdiction." However, SAIC offers no evidence that the particular DT beams used in the Shopping Center roof suffered from quality control problems. Indeed, as discussed above, SAIC's evidence suggests that FSC closely monitored any deflections of the DT beams by constantly installing additional roof drains. *See supra* note 16, at 10.

With respect to the expert testimony of meteorologist Núñez, SAIC points out that Núñez admitted that he had "no way of knowing if [a microburst] occurred ... because there is no particular study" and that it was only possible that a microburst occurred in the area. (Núñez Dep. at 80). SAIC also

argues that the very report Núñez relied upon in forming his expert opinion—the NOAA Survey—"found no evidence from which one could reasonably infer that microbursts occurred in the Fajardo area." (J.A. at 322). Again, we agree with the district court that SAIC has seriously mischaracterized Núñez's testimony as well as the conclusions of the NOAA Survey. Núñez in fact concluded that "the damages sustained by the Fajardo Shopping Center were the direct result of the intense and turbulent winds produced by Hurricane Hugo on September 18, 1989." (*Id.* at 2853). To reach this conclusion, Núñez examined the maximum wind speeds and corresponding mean recurrence interval for Hurricane Hugo at different locations in Puerto Rico, including the nearby Roosevelt Roads Naval Base.[17] (*See id.* at 2844). According to Núñez, these winds were "above the magnitude specified in the ANSI A58.1–1982 code." (*Id.*). More importantly, Núñez explained in his deposition testimony that despite the lack of availability of a Doppler radar or a debris analysis, it was his expert opinion, based on the NOAA Survey and the damage he observed on site, that downburst forces quite possibly occurred. (*See* Núñez Dep. at 79–81). We agree with the district court that Núñez reasonably relied on his expert opinion and the NOAA Survey for this conclusion. We further conclude that SAIC again mischaracterized the findings of the NOAA Survey. In sharp contrast to SAIC's assertion that this team of highly qualified experts "found no evidence from which one could reasonably infer that microbursts occurred in the Fajardo area", (J.A. at 322), the NOAA Survey concluded that "damage surveys suggested possible microbursts on St. Croix, Culebra and Vieques." (*Id.* at 1699). The Survey also stated that "[r]esidents, including personnel at the Roosevelt Road Naval Station believe that some tornadoes did occur although none

---

16. In its Statement of Contested Facts, SAIC asserts that "it is practically an undisputed fact that the Fajardo Shopping Center owners were constantly adding remedial roof drains ... to avoid water ponding." (Appellant's Statement of Contested Facts at 6). Although this evidence supports the undisputed fact that water ponding existed prior to Hugo, it does not necessarily support SAIC's contention that such water pond-

ing—allegedly the result of faulty design or construction—proximately caused the deflections that existed in the FSC roof after Hugo.

17. At oral argument, SAIC's attorney conceded that Roosevelt Roads Naval Base is approximately five to fifteen miles from the FSC area.

could be confirmed." (*Id.*). Despite SAIC's assertions to the contrary, these findings clearly do not preclude the possibility that downbursts occurred in the FSC area.

■ Finally, we agree with the district court that SAIC's reliance on Engineer Ruiz's future testimony at trial is insufficient to defeat summary judgment as to the issue of proximate causation.[18] It is an established rule of law that "establishing a genuine issue of material fact requires more than effusive rhetoric and optimistic surmise." *Cadle Company v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997). Neither "unsupported speculation, nor brash conjecture coupled with earnest hope that something concrete will materialize" is sufficient to block summary judgment. *Euromotion, Inc. v. BMW of North America, Inc.,* 136 F.3d 866, 869 (1st Cir.1998) (quoting *J.Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1251 (1st Cir.1996)) (internal quotations and citations omitted). We conclude that SAIC has failed to present any "genuine" evidence that water ponding due to inherent structural or construction defects proximately caused the damage to the FSC property. We point out that although there is evidence in the record that DT beams in the FSC roof had deflected prior to Hugo, FSC need not prove that wind was the sole cause of the damage to its property in order to prevail on summary judgment. *See supra,* at 12–14. "In order to recover [under windstorm insurance coverage] it is not necessary that windstorm be the sole cause of the damage. . . . If the damage would not have occurred in the absence of a windstorm, the loss is covered by the policy." *Milan v. Providence Washington Ins. Co.,* 227 F.Supp. at 253. Because FSC has presented unrefuted evidence that the damage to its

property would not have occurred but for Hurricane Hugo, we **affirm** the district court's entry of summary judgment on the issue of liability in its favor.

## 2. The Coinsurance Penalty

SAIC next argues that the district court erred in granting summary judgment in favor of FSC on the issue of the co-insurance penalty. The insurance policy contains a coinsurance clause which provides that:

> [t]he Company shall not be liable for a greater proportion of any loss to property covered than the limit of liability under this policy for such property bears to the amount produced by multiplying the actual cash value of such property at the time of the loss by the coinsurance percentage stated in the Declarations.

(J.A. at 2769). SAIC maintains that the FSC property is worth more than the amount declared in the policy. As a result, SAIC claims that, if liable, it is only obligated to pay that proportion of the damages equal to the proportion of the declared value to the actual value pursuant to the terms of the coinsurance clause.[19]

Another pertinent endorsement excludes from coverage "[p]roperty which is more specifically covered in whole or in part by this or any other contract of insurance, except for the amount of loss which is in excess of the amount due from such more specific insurance." (J.A. at 2777). FSC proffers the lease agreements between FSC and its Building I and Building II tenants, which provide that the tenants would purchase their own insurance to cover all leasehold improvements, to prove that SAIC only insured the structure of the buildings—not the

---

18. In its opposition to FSC's motion for summary judgment, SAIC seeks to rebut FSC's evidence with vague and generalized statements like: (1) Engineer Ruiz's testimony *"will also include* evidence of specific findings which confirm the pre-existent and considerable deflections on the Fajardo Shopping Center roof"* (J.A. at 317); (2) "Other reliable studies *which will be discussed* by defendant's expert during testimony at trial produced the same result" (*Id.* at 323); (3) "... *we will further illustrate* the absurdity of this contention by discussing additional testimony that will be offered at trial by Engineer Emili-

ano Ruiz" (*Id.* at 324); and (4) "More simply stated, the testimony of Engineer Emiliano Ruiz *will show* that Engineer Khan's calculations are nothing more than manipulation of numbers to suit his client's litigation needs." (*Id.* at 327) (emphasis added).

19. FSC declared that the property was worth $30,000. SAIC claims that the actual value of the property is $45,000. Thus, SAIC claims that, if liable, it is only obligated to pay ⅔ of the total damages.

leasehold improvements. As a result, FSC argues that the declared value of the property is in fact equal to the actual value of the insured structure and thus the coinsurance clause is inapplicable.[20]

In further support of this contention, FSC points to the Pretrial Report, submitted by both parties in December 1993, which includes as an undisputed fact the following information:

> Under the terms of the leases, tenants in the L-shaped building (Building "1") are responsible for the integrity and maintenance of their own leasehold improvements and insurance therefor. The policy does not cover property not owned by the landlord ... including leasehold improvements made by Tenants.... Tenants are required to maintain their own insurance, and all damage to leasehold improvements ... are for the account and responsibility of the respective tenants. The tenants have their own insurance policies covering their leasehold improvements. The lease for the Firestone Store (Building "2") contains similar provisions. The Kentucky Fried Chicken building (Building "3") had a different lease, according to which the Landlord provided, paid for, and owned what would otherwise have been the tenant leasehold improvements (i.e. a "turnkey" location), and the Landlord insured them. Since the plaintiff herein owned the leasehold improvements, the valuation limits under the Policy reflected a higher per-unit insurable value for Building "3".

(J.A. at 64).

Despite this earlier admission, SAIC now contends that Buildings I and II should now be appraised to include the value of the leasehold improvements, thus triggering the coinsurance penalty clause. We agree with the district court that by agreeing to the preceding "undisputed facts" in the Pretrial Report, SAIC has waived this argument. *See Correa v. Hospital San Francisco*, 69 F.3d 1184, 1195 (1st Cir.1995). We further agree that, even absent waiver, SAIC has failed to conclusively rebut the evidence prof-

fered by FSC. As a result, we conclude that FSC is entitled to judgment as a matter of law that the coinsurance penalty clause does not apply to reduce SAIC's liability under the terms of the policy.

### 3. The Emergency Repairs Setoff Issue

SAIC next appeals the district court's grant of summary judgment in favor of FSC with respect to its right to set off amounts spent by Pueblo Supermarkets for repairs against the $150,000 advanced by SAIC for emergency repairs immediately after the hurricane. SAIC objects to this ruling on the ground that the Pueblo setoff is essentially a new claim, and that for this claim to proceed, FSC should be required to request leave to file an amended complaint. Absent such a request, SAIC maintains that the district court "flagrantly deviated from the mandates provided by the Federal Rules of Civil Procedure" by accommodating FSC's attempt at "ambush litigation." (Appellant's Br. at 45).

It is undisputed that SAIC advanced FSC the sum of $150,000 for emergency repairs. After reviewing FSC's receipts, the special master found that FSC used the amount of $104,199.11 to conduct emergency repairs on Building I. The special master also found that some of this money had been inappropriately used to pay FSC's accountants. Accordingly, the special master subtracted this amount ($9,685) from the amount used for repairs. The master concluded that FSC appropriately spent $94,514.11 of the $150,000 in emergency repairs. Thus, FSC owed SAIC $50,485.89 plus compound interest of 5% per annum, amounting to a total of $71,083.72.

On May 7, 1997, FSC, for the first time, submitted receipts evidencing additional temporary repairs made by Pueblo. According to the documentation, Pueblo spent $146,000 on emergency repairs immediately after Hugo. It is undisputed that FSC reimbursed Pueblo for these expenditures in the form of rent concessions. FSC argued that since the

---

**20.** In other words, FSC argues that the value of the structure of the buildings—not including any leasehold improvements—is in fact $30,000 and thus the declared value is equal to the actual value. As a result, the coinsurance penalty clause *is inapplicable.*

$146,000 was spent by Pueblo on Fajardo's behalf, it was entitled to offset (or set off) this amount against the $150,000 advance pursuant to Article 1149 of the Puerto Rico Civil Code.[21] To support this claim, FSC points out that setoff is appropriate in this case because it arises from the same breach of contract claim that is the subject of this litigation. Further, FSC maintains that SAIC has actually benefitted from Pueblo's expenditures because by undertaking the repairs on its own, Pueblo substantially reduced its claim for business interruption. Thus, FSC argues, if the setoff is not allowed, SAIC will receive unjust enrichment.

At the May 7 hearing in chambers, the district judge admonished FSC for the tardiness of its setoff claim. However, the judge ultimately allowed FSC's setoff claim to proceed. The grounds for the district judge's ultimate decision to allow the setoff claim are unclear. FSC never filed a motion for leave to amend the complaint. Nor was any amendment made. Nevertheless, FSC submitted the claim in a supplemental motion for summary judgment filed on September 30, 1997.

In ruling on this motion, the district judge specifically found that FSC had established the requisites for compensation as set forth in Article 1150.[22] We agree with the district court that FSC has established the requisites for a setoff under Puerto Rico law.[23] We further conclude that no leave to file an amended complaint was required for FSC to state its setoff claim. As the district court correctly noted, setoffs have no purpose other than to "[allow] the convenient simplification of relations between mutually indebted parties." 999 F.Supp. at 230–31 (quoting *United Structures of Am., Inc. v. G.R.G. Eng'g, S.E.*, 9 F.3d 996, 1000 (1st Cir.1993)). As such, FSC's setoff "claim" is not really a separate claim at all from its original claim for an accounting and determination of the amount of SAIC's liability. As FSC correctly points out, the accounting for the $150,000 advanced by SAIC was in issue from the inception of the case. Moreover, although the proffer of Pueblo's receipts was tardy, the district court specifically concluded that SAIC was not prejudiced by the delay.[24] In sum, we agree with the district court that SAIC presented insufficient evidence to rebut FSC's claim that it was entitled, as a matter of law, to entry of judgment in its favor on the setoff claim.

#### 4. Business Interruption/Lost Rents

The pertinent policy endorsement states that coverage is extended to insure against

---

**21.** Article 1149 of the Puerto Rico Civil Code states: "[c]ompensation shall take place when two (2) persons, in their own right, are mutually creditors and debtors of each other." P.R. Laws Ann. tit. 31, § 3221 (1990).

Despite the fact that this additional expenditure would result in a credit owing to FSC in the amount of $74,916.28, FSC waived any claim for this credit.

**22.** Article 1150 sets forth the requisites for compensation under Article 1149:

In order that compensation may be proper, it is required:
(1) That each of the persons bound should be so principally, and that he be at the same time the principal creditor of the other.
(2) That both debts consist of a sum of money
. . .
(3) That both debts are due.
(4) That they be determined and demand able.
(5) That none of them is subject to any retention or suit instituted by a third person, and of which due notice has been given the debtor.
P.R. Laws Ann. tit. 31, § 3222 (1990).

**23.** SAIC also concedes this point in its brief: "Appellant does not dispute that Puerto Rico law provides for a set off when two individuals are mutually creditors and debtors." (Appellant's Br. at 45). Accordingly, SAIC's only objection to the district court's grant of a setoff in the instant case is that "the basis for said set off has not been properly plead and thus the dispute is not before the Court." (*Id.*). As will be discussed, we disagree with this contention.

**24.** In response to SAIC's objections to FSC's setoff claim on the ground that SAIC was not allowed to conduct discovery because the claim was not officially before the court, the district judge stated:

The Court does not agree with you. You had ample time to make discovery regarding that claim. That claim was raised by the Court in chambers.... It is true that it was the first time that they mentioned it. I mentioned that it was tardy but said it would be taken into consideration in due course and I would withhold any ruling on that. By itself it should give you plenty of notice regarding the discovery.... I believe regarding discovery you were not diligent regarding that claim. (10/30/97 Tr. at 19–20).

"loss of rents caused by the perils insured against damaging or destroying, during the policy period, real or personal property at the premises described in this endorsement." (J.A. at 2765). FSC originally claimed business interruption damages in the amount of $77,109.37 based on an expert report rendered by the accounting firm of Vélez, Semprit, Nieves & Co. However, the special master, in his first Report and Recommendation, concluded that FSC misused $50,485.89 of the $150,000 in emergency repair funds advanced by SAIC. Specifically, the special master found that the $50,485.89 misused by FSC could have been used to repair Buildings II and III. The special master thus recommended that the district court not allocate any amounts for business interruption as to these buildings. As a result, FSC reduced the amount of its business interruption damages claim by $50,485.89 to $26,943.37.

In its opposition to FSC's motion for summary judgment on the issue of lost rent, SAIC maintains that FSC's claims are "grossly exaggerated" and that "it does not take a genius to know that a reduction in volume of sales in the Fajardo area after Hurricane Hugo was expected due to the devastation of the hurricane in the immediate area." (J.A. at 346). The weakness in SAIC's argument, however, lies in the fact that it does not offer any evidence to support these conclusory statements. SAIC's opposition relies on statements like "the evidence *will show*" and "the evidence *will further show.*" (*Id.* at 344, 349)(emphasis added). Unfortunately for SAIC, at the summary judgment stage, it bears the burden of actually presenting this evidence; it cannot rely on "brash conjecture coupled with earnest hope that something concrete will materialize" and expect to survive a motion for summary judgment. *Euromotion*, 136 F.3d at 869 (quoting *J.Geils Band*, 76 F.3d at 1251) (internal quotations and citations omitted). We agree with the district court that SAIC failed to meet its burden of proof in order to defeat FSC's motion for summary judgment on the issue of business interruption/lost rent damages. We thus affirm the district court's award of $26,943.37 in damages to FSC for lost rent and business interruption.

### 5. Obstinacy

SAIC's final complaint centers around the district court's award of prejudgment interest in the amount of $868,826.60 plus attorneys' fees, based on its finding that SAIC displayed obstinacy throughout the proceedings below. FSC requested an award of prejudgment interest and attorneys' fees pursuant to Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure. Rule 44.1(d) states: "In the event any party or its lawyer has acted obstinately or frivolously, the court *shall,* in its judgment, impose on such person the payment of a sum for attorneys' fees which the court decides corresponds to such conduct." (Emphasis added). Similarly, Rule 44.3(b) states: " .... the court *will* also impose on the party that has acted rashly the payment of interest at the rate fixed by the Board...." (Emphasis added).

▮▮▮ In a diversity case in which the substantive law of Puerto Rico supplies the basis of decision, a federal court must give effect to Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure. *See Dopp v. Pritzker*, 38 F.3d 1239, 1252 (1st Cir.1994) (quotations omitted). Moreover, because these rules speak in imperatives, the imposition of attorneys' fees and prejudgment interest is obligatory once the district court makes a threshold finding that a party has acted with obstinacy. *See id.* We review the district court's threshold determination of obstinacy for abuse of discretion. *See id.* at 1253.

▮▮▮ To make a threshold determination of obstinacy, a court must "determine a litigant to have been unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby wasting time and causing the court and the other litigants unnecessary expense and delay." *De León López v. Corporación Insular de Seguros*, 931 F.2d 116, 126 (1st Cir.1991). Puerto Rico courts have previously imposed obstinacy-based attorneys' fees on insurance companies that unreasonably refuse to settle out of court claims. *See, e.g., Morales v.*

*Automatic Vending Service, Inc.*, 103 D.P.R. 281, 1975 WL 38864 (1975).

█ In the instant case, the district court found that SAIC was "unreasonably adamant" and "stubbornly litigious" by refusing to settle this claim for over three years, while the property's losses increased and FSC was forced to hire more experts and incur mounting expenses. *See* 999 F.Supp. at 233. The district court further concluded with respect to SAIC's obstinacy that "the record speaks for itself." *Id.* at 234. After examining the record, we conclude that the district court did not abuse its discretion in making the threshold determination of obstinacy and thus affirm its grant of prejudgment interest and attorneys' fees to FSC.

The record reveals that SAIC's only settlement offers have been unreasonable in that they have only covered a fraction of the damages proposed by plaintiff. *See supra*, at 4–5, 6. In addition, after opposing FSC's motion for a jury trial and agreeing to the appointment of a special master, SAIC proceeded to object to every report rendered by the master and refused to cooperate with him throughout the proceedings. It is important to note that SAIC's substantive objections to the role of the special master, discussed *supra*, at 8–12, do not provide the basis for our affirmance of the district court's finding of obstinacy. Rather, we conclude that the district court's finding of obstinacy is adequately supported by: (1) SAIC's original failure to timely submit names of candidates for appointment as special master in accordance with the court's order; (2) its subsequent barrage of unwarranted allegations regarding the ultimate appointee's "lack of objectivity, neutrality and clear bias in favor of the plaintiff" (J.A. at 268); (3) its unsubstantiated allegations that the special master's findings were "nothing more than speculation" (*Id.* at 273); (4) its uncalled for allegations that "as a matter of fact . . . [Special Master Murati] was not qualified to make most of the recommendations contained in the report" (*Id.* at 343); and (5) its adamant refusal to participate in the discovery process conducted by the special master. SAIC's refusal to cooperate forced the special master to revise his report and recommendation three times, further increasing the costs of this litigation. SAIC's personal attacks on Murati caused him to suspend his duties and file a separate motion in defense of his work. In sum, all of these actions by SAIC wasted considerable time and caused the court and FSC unnecessary expense and delay. Based on our review of the record, we thus conclude that the district judge acted within his discretion in awarding prejudgment interest and attorneys' fees to FSC based on a finding of obstinacy.

## IV. CONCLUSION

For the reasons detailed in this opinion, we **affirm** the district court's grant of summary judgment in favor of FSC. We also **affirm** the court's grant of prejudgment interest and attorneys' fees. Costs to be awarded to appellees.