<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-1649

                 FAJARDO SHOPPING CENTER, S.E.,
                   A NEW JERSEY PARTNERSHIP,
                      Plaintiff, Appellee,

                               v.

      SUN ALLIANCE INSURANCE COMPANY OF PUERTO RICO, INC.,
       SUBSIDIARY OF ALLIANCE ASSURANCE COMPANY LIMITED,
                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

        [Hon. Salvador E. Casellas, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

Hall, Senior Circuit Judge,

                   and Lynch, Circuit Judge.

                     _____________________

    Luis A. Gonzlez, with whom L.A. Gonzlez Law Offices, P.A.was on brief, for appellant.
    Edward M. Borges, with whom David Riv-Power and O'Neill &
Borges were on brief, for appellee.

                      ____________________

                       February 3, 1999
                      ____________________

         TORRUELLA, Chief Judge.  Plaintiff Fajardo Shopping
Center, S.E. ("FSC") filed this action against Defendant Sun
Alliance Insurance Company of Puerto Rico, Inc. ("SAIC") to recover
insurance policy benefits in connection with damage to commercial
leasehold property allegedly sustained during Hurricane Hugo.  
After approximately five years of discovery, the district court
granted summary judgment in favor of FSC on the issues of liability
and damages and ordered SAIC to pay FSC $1,301,856.77.  The
district judge also awarded FSC prejudgment interest in the amount
of $868,826.60 plus attorneys' fees.  SAIC appeals both the
district court's grant of summary judgment and its award of
prejudgment interest and attorneys' fees.
I.  BACKGROUND
         The Fajardo Shopping Center ("Shopping Center" or "FSC")
is a three-building structure located in the northeastern
municipality of Fajardo, Puerto Rico.  For the past twelve years,
it has been owned by an entity known as the Fajardo Partnership, a
partnership organized under the laws of the state of New Jersey.  
Its principal building, Building I, is an L-shaped structure, units
of which are leased to more than a dozen retail merchants,
including Pueblo Supermarkets, its main tenant.  The remaining two
structures, Buildings II and III, have throughout the relevant time
period been rented to a Firestone and a Kentucky Fried Chicken
franchise, respectively.
         On December 19, 1988, the Fajardo Partnership obtained a
special multi-peril insurance policy from SAIC for the period of
December 19, 1988 through April 22, 1991.  (See J.A. at 778).  The
policy insured the Shopping Center against "all risks of direct
physical loss subject to the provisions and stipulations herein and
in the policy of which this form is made a part."  (Id. at 785).  
The policy also insured against the loss of rents by the Fajardo
Partnership caused by a covered risk.  (See id. at 779).  One of
the pertinent exclusions included in the policy excepted from
coverage losses caused by "faulty design, specifications,
workmanship, construction, or materials if a peril excluded by this
policy contributed to the loss at any time."  (Id. at 786).  None
of the provisions or stipulations made a part of the policy
excluded losses caused by a hurricane or windstorm.    
    On September 18, 1989, Hurricane Hugo struck the island
of Puerto Rico.  At maximum sustained winds of 125 miles per hour,
the western part of Hurricane Hugo's eyewall passed directly
through the municipalities of Ceiba, Fajardo and Luquillo.  The
intense winds did not, however, translate into unusually heavy
rainstorms.  San Juan reported only 1.4 inches of rain while
Fajardo reported approximately 6.25 inches.
    During Hurricane Hugo, the FSC property suffered
extensive damages.  Specifically, structural double-tee beams ("DT
beams") supporting the roof of the Shopping Center deflected,
losing their structural integrity.  As a result of this deflection,
portions of the FSC roof collapsed.  Other portions of the roof,
although not collapsed, were rendered structurally unsound and
posed a risk of collapse.   
    Upon plaintiff's request, SAIC advanced FSC $150,000 to
cover emergency repairs and to prevent further damage to the
Shopping Center property.  Shortly thereafter, FSC engaged an
engineering firm, Izquierdo, Rueda & Associates ("IR&A"), to
prepare an estimate of damages.  The firm concluded that
approximately 75,000 square feet of roof would have to be replaced
because of structural damage.  IR&A estimated the total cost of
repairs to be $1,496,218.  In early 1991, FSC submitted the firm's
report and estimate to SAIC.   
    On May 7, 1991, a meeting was held at the SAIC offices to
discuss FSC's claim.  SAIC followed up the meeting with a letter to
FSC dated July 1, 1991.  In its letter, SAIC requested additional
information and permission to carry out inspections of the
property.  The letter also stated that, despite its advance of
$150,000, SAIC was reserving all of its rights under the policy
because it had concluded that most of the damage to the roof was
caused by preexisting structural defects in the DT beams, and not
by Hurricane Hugo.
    In a subsequent letter dated August 19, 1991, SAIC
informed FSC of the results of an inspection of the FSC property
performed by its engineer, Emiliano Ruiz ("Ruiz").  According to
Ruiz, the deflections of the DT beams were not caused by windstorm
but rather by the ponding of water due to a faulty and inadequate
drainage system.  SAIC further stated that such water ponding,
"plus other factors such as inherent or latent defect of the beams
. . . construction and design deficiencies, and the fact that the
building was not built according to the best engineering practices
indicate that the damages claimed . . . are excluded under Part
VIII, Items 2 and 4C of the above policy."  (J.A. at 2797).  As a
result, SAIC agreed to pay exclusively for: (1) the removal and
replacement of built-up roofing and hung ceiling; (2) the removal
of debris and clean-up; (3) repair to air conditioning and
electrical systems; and, (4) the replacement of store front glass,
flashings, paint work, and parking illumination.  SAIC calculated
its liability under the policy to be $96,584.46, after subtracting
the advanced amount ($150,000), the coinsurance penalty ($127,292),
and the deductible ($3,000).  SAIC submitted this amount to FSC as
a proposed proof of loss.
    Upon examining SAIC's proposal, FSC conducted further
investigations to prove that the damages suffered resulted from the
hurricane and not from inherent or latent design defects.  FSC's
investigation included: (1) a survey of the damage performed by
Sousa Surveying Services; (2) an opinion as to the cause of the
damage from structural expert Jos M. Izquierdo ("Izquierdo"); (3)
an accountant's report prepared by CPA Rafael Prez-Villarini
("Prez-Villarini") detailing the amount of rent lost; and (4) a
second cost estimate rendered by the late Engineer Jos Carbia.  As
a result of this investigation, FSC submitted its own proof of loss
to SAIC on October 27, 1992, claiming damages in the amount of
$1,944,356.73.  SAIC promptly rejected FSC's proof of loss,
reasserted its theory of causation, and resubmitted its previous
offer of $96,584.46.  Shortly thereafter, FSC filed the instant
action.
II.  THE APPOINTMENT OF A SPECIAL MASTER
    On July 5, 1995, FSC moved for a jury trial.  SAIC
opposed the motion on the ground that the case was "extremely
technical in nature and involve[d] construction issues . . . which
are beyond the knowledge of the common citizen."  (J.A. at 135-36).  
In response, the court scheduled a conference for December 11,
1995, to address the issues raised by the parties and to explore
settlement possibilities.  After hearing arguments from both
parties, the court denied FSC's motion for a jury trial.  In
addition, the court determined that "the appointment of a [Special]
Master [would] be appropriate in this case."  (Mins. of 12/11/95
Proceedings).  The court granted the parties until January 15,
1996 to submit three candidates for appointment as special master.
    On March 18, 1996, FSC informed the court that, of all
the candidates it contacted, only one -- Engineer Efrahim Murati-
Martnez ("Murati") -- was willing to serve as a special master in
an adversarial proceeding.  SAIC never objected to FSC's motion
proposing Murati's appointment.  Nor did SAIC submit names of
candidates for special master.  Therefore, after considering his
qualifications, the court appointed Murati to serve as special
master.   
    Pursuant to Rule 53(c), the court's order of appointment
enumerated Murati's rights, powers, and responsibilities as special
master.  Specifically, the court's order granted the special master
"all the rights, powers, and duties as provided for a master under
Rule 53 of the Federal Rules of Civil Procedure."  (J.A. at 158).  
On June 5, 1996, Murati accepted his appointment.  The very next
day, SAIC submitted -- for the first time -- its proposed candidate
for special master.  In its Motion Requesting Appointment of
Special Master, SAIC never objected to the court's power to appoint  
a master.  Nor did SAIC object to Murati's actual mandate.  Rather,
the essence of SAIC's objection was that Murati did not have
sufficient formal training in structural problems to act as master
in this case.  (See id. at 162).  In its order denying SAIC's
motion, the court addressed this issue by stating: "Special Master
Murati will remain as Master in this case.  His performance so far
belies any claims by defendant as to his suitability for the post."  
(Id. at 169).
    SAIC now argues on appeal that the district court's
appointment of a special master in this case violated Fed. R. Civ.
P. 53 and Article III of the United States Constitution.  Because
we conclude that SAIC's failure to object to the district court's
appointment of a special master amounts to consent, we do not reach
the merits of this claim.
III.  DISCUSSION
    A.  THE SPECIAL MASTER
    As this court has recognized, "parties to a civil case
may consent to the appointment of a master under any
circumstances."  See Stauble v. Warrob, 977 F.2d 690, 694 (1st Cir.
1992); see also Peretz v. United States, 501 U.S. 923, 936 (1991)
("litigants may waive their personal right to have an Article III
judge preside over a civil trial"); Goldstein v. Kelleher, 728 F.2d
32, 35 (1st Cir. 1992) ("insofar as Article III protects individual
litigants, those protections can be waived").  Even if SAIC did not
explicitly consent to the appointment of a special master, failure
to make a timely objection amounts to consent.
         A party who desires to contest the
         propriety of a reference to a master under
         Rule 53 should move the trial court for
         revocation of the reference.  Inaction in
         this regard is tantamount to acquiescence
         and the reference cannot be challenged
         later on appeal.

9A Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure Civil 2d  2605 (2d ed. 1994); see also Adriana Int'l
Corp. v. Thoeren, 913 F.2d 1406, 1410 (9th Cir. 1990) ("[A]n
objection to the appointment of a special master must be made at
the time of the appointment or within a reasonable time thereafter
or the party's objection is waived."); Johnson Controls, Inc. v.
Phoenix Controls Systems, Inc., 886 F.2d 1173, 1176 (9th Cir. 1989)
(party "waived any objections it had to the appointment of a master
by failing to raise the issue, or moving to have the reference
revoked"); Charles A. Wright, Inc. v. F.D. Rich Co., 354 F.3d 710,
714 (1st Cir. 1966) ("Both parties consented to the court's order
of reference to the master and . . . plaintiff cannot now object to
the order of reference.").    
    Not only did SAIC not make a timely objection, SAIC never
made any objection at all to the district court's power to appoint
a special master in this case.  Indeed, the district court's
decision to appoint a master appears to have at least in part
resulted from SAIC's opposition to FSC's Motion for Jury Trial on
the ground that the issues involved were "beyond the knowledge of
the common citizen."  (J.A. at 135-36).  SAIC even proposed its own
candidate to serve as master.  Such conduct does not amount to a
timely objection to an order of reference.      
    Because SAIC consented to the appointment of a special
master and to the district court's order of reference, SAIC cannot
now object.  Moreover, SAIC waived any objection it may have had by
not presenting it to the district court when the district court
first raised the idea of appointing a special master.  We do not
hear arguments which were not raised with the district court.  SeeUnited States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997)
(matters not squarely presented below generally cannot be advanced
on appeal); Daigle v. Maine Medical Center, Inc., 14 F.3d 684, 687
(1st Cir. 1994) ("Our law is clear that a party ordinarily may not
raise on appeal issues that were not seasonably advanced (and
hence, preserved) below."); United States v. Slade, 980 F.2d 27, 30
(1st Cir. 1993) ("It is a bedrock rule that when a party has not  
presented an argument to the district court, she may not unveil it
in the court of appeals.").  Accordingly, we decline to reach the
merits of SAIC's special master claims.  
    B.  SUMMARY JUDGMENT
         1.  SAIC's Liability
    The question presented by this lawsuit is whether the
damage suffered by the Shopping Center was caused by the forces of
Hurricane Hugo (a covered peril) or by the faulty design and
structure of the DT beams and the Shopping Center roof (excluded
perils).  Concluding that no genuine issues of material fact
existed as to the cause of the damage to the Shopping Center, the
district court granted summary judgment on the issue of liability
in favor of FSC.  SAIC appeals.  We review the district court's
grant of summary judgment de novo, viewing the facts in the light
most favorable to the nonmovant, defendant SAIC.  See Dominique v.
Weld, 73 F.3d 1156, 1158 (1st Cir. 1996).
    Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is entitled
to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In this
context, an issue is "genuine" if the evidence presented is such
that a reasonable jury could resolve the issue in favor of the
nonmoving party and a "material" fact is one that might affect the
outcome of the suit under governing law.  See Pagano v. Frank, 983
F.2d 343, 347 (1st Cir. 1993).
        On issues where the nonmovant bears the burden of proof
at trial, he may not defeat a motion for summary judgment by
relying upon evidence that is "merely colorable" or "not
significantly probative."  Id. (internal quotations and citations
omitted).  Instead, the nonmovant must present "definite, competent
evidence" to rebut the motion.  Id. (quoting Mesnick v. General
Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).  Summary judgment
will be properly entered against a party who, "after adequate time
for discovery . . . fails to make a showing sufficient to establish
the existence of an element essential to that party's case, and on
which that party will bear the burden of proof at trial."  Celotex
Corp. v. Catrett, 477 U.S. 317, 322 (1986).
            a.  Applicable Law  
        Both parties concede that Puerto Rican law governs the
instant insurance contract dispute.  Nevertheless, the Puerto Rico
Supreme Court has recently established that since most of the
insurance contracts sold in Puerto Rico are modeled after contracts
drafted in the United States, both federal and state law principles  
are useful and persuasive.  See Quiones Lpez v. Manzano Pozas, 96
J.T.S. 95, at 1307, P.R. Offic. Trans. No. RE-91-567, slip op. at
11-12 (P.R. June 25, 1996).  We thus expand our analysis beyond
Puerto Rican civil law principles.
        Under an all-risk insurance policy, the insured has the
burden of establishing a prima facie case for recovery by proving
the existence of the all-risk policy and the loss of the covered
property.  See Jomark Textiles, Inc. v. Int'l Fire & Marine Ins.
Co., 771 F. Supp. 577, 578-79 (S.D.N.Y. 1989) (quotations omitted).  
Once the insured has established a prima facie case, the burden
shifts to the insurer to prove that the claimed loss is excluded
from coverage under the policy.  See id. (quotations omitted).   
        In the instant case, SAIC admitted that the applicable
exclusion clause was Section VI, Item 9, which excepts from
coverage losses caused by "faulty design, specifications,
workmanship, construction, or materials if a peril excluded by this
policy contributed to the loss at any time."  (J.A. at 786).  Thus,
to avoid entry of summary judgment against it, SAIC bears the
burden of making "a showing sufficient to establish," Celotex, 477
U.S. at 322, that the damage to the FSC property was caused by
"faulty design, specifications, workmanship, and construction" --
damage excluded from coverage under the policy.  See Jomark, 771 F.
Supp. at 578-79.  More specifically, in order to avoid liability
under the policy, SAIC ultimately must prove that the defective
design of the DT beams and the FSC roof -- not Hurricane Hugo --
was the proximate cause of the damage to the Shopping Center.  Seeid.  Moreover, under Puerto Rico law, insurance contracts, by
virtue of being considered adhesion contracts, are liberally
construed in favor of the insured.  Quiones Lpez,, 96 J.T.S. 95,
at 1306, P.R. Offic. Trans. No. RE-91-567, slip op. at 10 (P.R.
June 25, 1996) (quotations omitted).  Likewise, exclusion clauses
-- not usually favored in an insurance contract -- should be
strictly construed against the insurer.  See id.    
    To determine whether a particular risk was the proximate
cause of the damage suffered, one must examine whether the
resulting damage was to be expected within the ordinary course of
events.  See Crdenas Maxan v. Rodrguez, 90 J.T.S. 36, at 7559,
P.R. Offic. Trans. No. RE-88-223, slip op. at 6 (P.R. Mar. 9,
1990); Arroyo Lpez v. Comm. of Puerto Rico, 90 J.T.S. 101, at
7937, P.R. Offic. Trans. No. RE-88-379, slip op. at 8 (P.R.
June 29, 1990).  In cases where concurrent causes are alleged to
have caused the damage, we must determine which cause is the most
"efficient" one.  See Valle v. American Int'l Insurance Co., 108
D.P.R. 692, at 697-98, 8 P.R. Offic. Trans. 735, 739 (P.R. 1979);
see also Allstate Ins. Co. v. Smith, 929 F.2d 447, 451 (9th Cir.
1991) ("In determining whether a loss is within an exception in a
policy, where there is a concurrence of different causes, the
efficient cause -- the one that sets others in motion -- is the
cause to which the loss is to be attributed . . . .") (quoting
Sabella v. Wisler, 59 Cal.2d 21, 27 Cal. Rptr. 689, 377 P.2d 889
(Cal. 1963) (internal quotations and citations omitted)).
    Applying this analysis to windstorm insurance cases, most  
courts have agreed that wind need not be the only cause of a loss
for it to be considered the proximate or efficient cause.  In
order to recover under windstorm insurance coverage, "it is
sufficient to show that wind was the proximate or efficient cause
of loss or damage notwithstanding other factors contributed to the
loss."  Kemp v. American Universal Ins. Co., 391 F.2d 533, 534-35
(5th Cir. 1968).  For example, in Milan v. Providence Washington
Ins. Co., the district court concluded that alleged structural
defects in a building were immaterial to the issue of liability
under a windstorm insurance policy.  The court reiterated that
"[i]n order to recover . . . it is not necessary that windstorm be
the sole cause of the damage . . . . If the damage would not have
occurred in the absence of a windstorm, the loss is covered by the
policy."  227 F. Supp. 251, 253 (E.D. La. 1964).  One court has  
even gone so far as to hold that "where a policy expressly insures
against direct loss and damage by one element but excludes loss or
damage by another element, the coverage extends to the loss even
though the excluded element is a contributory cause."  General Am.
Transp. Corp. v. Sun Ins. Office, Ltd., 369 F.2d 906, 908 (6th Cir.
1966).
              b.  The Evidence
    FSC maintains that downburst forces accompanying
Hurricane Hugo proximately caused the damage to the Shopping
Center.  FSC further maintains that the damage could not have been
caused by faulty design or structural defects.  FSC's basic
argument is: but for the hurricane, no damage would have resulted.
    In support of this contention, FSC offers the expert
testimony of its structural experts Izquierdo and Khan.  Both
Izquierdo and Khan specifically concluded that the Shopping Center
was properly constructed.  (See Izquierdo Dep. at 51; J.A. at 2417;
Khan 7/17/96 Dep. at 119).  Khan further concluded, after
conducting  extensive testing on the DT beams, that the original
design of all of the DT beams met the design and deflection
criteria required by the Puerto Rico Building Code applicable at
the time of construction.  (See J.A. at 2417).  Both experts
concluded that faulty design and construction could not have caused
the deflections existing after Hurricane Hugo.
    In support of its theory that Hurricane Hugo was the
proximate cause of the damage to the FSC property, FSC points to
the fact that all of the experts -- including SAIC's own expert
Emiliano Ruiz -- agree that there was a danger of collapse after
Hugo that did not exist prior thereto.  (See Ruiz Dep. at 93;
Izquierdo Dep. at 102; Khan 7/17/96 Dep. at 119, 147).  FSC further
points to the deposition testimony of meteorologist Edwin Nez who
concluded that because conditions favorable for microbursts existed
over Fajardo, it is quite possible that a microburst did in fact
occur in the FSC area.  (See J.A. at 2846).  Nez also concluded
that -- whether characterized by a microburst or flow separation
and turbulence -- the "severe conditions, as the hurricane's
eyewall passed over the Fajardo Shopping Center, very likely
produced the collapse of its roof."  (J.A. at 2851).  As proof that
such wind damage is possible, FSC makes reference to the most
recent revisions to the ASCE-ANSI Building Code, which confirm that
hurricanes have downburst forces capable of causing damage like
that suffered by FSC.
    In order to rule out the possibility that water ponding
due to faulty design caused the damage to the roof, FSC points to
the fact that the Shopping Center roof had never undergone such
severe deflections in the twenty years prior to Hugo -- even during
times of much more intense rainfall.  (See Izquierdo Dep. at 91).  
As SAIC points out, Izquierdo conceded that the Shopping Center
roof may have been compromised before Hugo, but Izquierdo also
testified that every structure designed, is designed to suffer
deflections "because no structure whatsoever, or nobody can attain
[sic][a structure] without deflection."  (Izquierdo Dep. at 102).  
Izquierdo further testified that even if the FSC roof had deflected
prior to Hugo, the structure "had been inspected [before Hugo] by
the insurers, the structure had been inspected and had been
accepted as a good structure."  (Izquierdo Dep. at 104).  Most
importantly, the structural analysis of FSC expert Siddiq Khan
demonstrated that it was "physically impossible" for water ponding
alone to have caused the damage to the FSC roof because the height
of water necessary to cause the amount of deflection that occurred
was higher than the elevation of the DT beams.  (See J.A. at 2411-
12, 2429, Appendix VIII at 2627; Khan 7/16/96 Dep. at 51-52, 75).  
In other words, it would be physically impossible to place on the
roof the amount of water necessary to cause the deflections that
resulted because the water would spill over the sides of the roof
before reaching the necessary depth.  (See Khan 7/16/96 Dep. at 51-
52, 75-76).  
    To rebut this evidence and meet its own burden of proving
that faulty design and construction was the proximate cause of the
damage to the FSC roof, SAIC points to the "overwhelming evidence"
in the record that the FSC building suffered inherent structural
defects.  SAIC's "overwhelming evidence" consists of a letter
written by Engineer Alfonso Vick ("Vick") in 1974 in which
reference is made to a deflection of up to 14 inches in the DT
beams due to water ponding.  Unfortunately for SAIC, the Vick
letter is inadmissible hearsay, and, as a result, may not be
considered on summary judgment.  See Vzquez v. Lpez-Rosario, 134
F.3d 28, 33 (1st Cir. 1998) ("Evidence that is inadmissible at
trial, such as inadmissible hearsay, may not be considered on
summary judgment.").   
    As further evidence of the Shopping Center's preexisting
structural defects, SAIC points to Engineer David McCloskey's
("McCloskey") 1980 inspection report of the FSC property.  
According to McCloskey's visual inspection of the FSC property,
there was "excessive ponding" over Pueblo and "some ponding" over
Walgreens.  (See Letter from McCloskey to Edward Kildare of
4/14/80, at 1).  SAIC maintains that these observations, made by a
"totally independent" structural engineer, prove that the FSC
property was structurally defective.  However, we agree with the
district court that SAIC has grossly mischaracterized McCloskey's
conclusions.  In fact, McCloskey's report concludes that "in
general the structures are in good condition" and that "[t]he only
immediate repair required is the roof of the Pueblo Store
Expansion."  (Letter from McCloskey to Edward Kildare of 5/21/80,
at 3).  McCloskey further explains that DT beams "typically
continue to deflect over the years causing portions of the roofs
which were ridges to become valleys, and vice versa.  Therefore,
roof drains end up at the high points of the roof which leads to
ponding."  (Id. at 1).  To address this "fairly common" phenomenon,
McCloskey suggested the installation of additional roof drains to
the new low points of the roof.  (See id. at 1).  As SAIC's own
evidence demonstrates, FSC constantly monitored this situation by
installing additional drains in the roof of the Shopping Center.  
More importantly, when asked in his deposition whether the roof was
structurally sound as built and designed, Engineer McCloskey
answered in the affirmative.  (See McCloskey Dep. at 51).  In sum,
McCloskey's report in no way supports SAIC's contention that the
Shopping Center had preexisting structural or construction defects.
    In addition, SAIC maintains that FSC's own expert,
Engineer Izquierdo, admitted that DT beams "have had a considerable
amount of quality control problems [in Puerto Rico], which is why
they are rarely used anymore in this jurisdiction."  However, SAIC
offers no evidence that the particular DT beams used in the
Shopping Center roof suffered from quality control problems.  
Indeed, as discussed above, SAIC's evidence suggests that FSC
closely monitored any deflections of the DT beams by constantly
installing additional roof drains.  See supra note 16, at 20.
    With respect to the expert testimony of meteorologist
Nez, SAIC points out that Nez admitted that he had "no way of
knowing if [a microburst] occurred . . . because there is no
particular study" and that it was only possible that a microburst
occurred in the area.  (Nez Dep. at 80).  SAIC also argues that
the very report Nez relied upon in forming his expert opinion --
the NOAA Survey -- "found no evidence from which one could
reasonably infer that microbursts occurred in the Fajardo area."  
(J.A. at 322).  Again, we agree with the district court that SAIC
has seriously mischaracterized Nez's testimony as well as the
conclusions of the NOAA Survey.  Nez in fact concluded that "the
damages sustained by the Fajardo Shopping Center were the direct
result of the intense and turbulent winds produced by Hurricane
Hugo on September 18, 1989."  (Id. at 2853).  To reach this
conclusion, Nez examined the maximum wind speeds and
corresponding mean recurrence interval for Hurricane Hugo at
different locations in Puerto Rico, including the nearby Roosevelt
Roads Naval Base.  (See id. at 2844).  According to Nez, these
winds were "above the magnitude specified in the ANSI A58.1-1982
code."  (Id.).  More importantly, Nez explained in his deposition
testimony that despite the lack of availability of a Doppler radar
or a debris analysis, it was his expert opinion, based on the NOAA
Survey and the damage he observed on site, that downburst forces
quite possibly occurred.  (See Nez Dep. at 79-81).  We agree with
the district court that Nez reasonably relied on his expert
opinion and the NOAA Survey for this conclusion.  We further
conclude that SAIC again mischaracterized the findings of the NOAA
Survey.  In sharp contrast to SAIC's assertion that this team of
highly qualified experts "found no evidence from which one could
reasonably infer that microbursts occurred in the Fajardo area",
(J.A. at 322), the NOAA Survey concluded that "damage surveys
suggested possible microbursts on St. Croix, Culebra and Vieques."  
(Id. at 1699).  The Survey also stated that "[r]esidents, including
personnel at the Roosevelt Road Naval Station believe that some
tornadoes did occur although none could be confirmed."  (Id.).  
Despite SAIC's assertions to the contrary, these findings clearly
do not preclude the possibility that downbursts occurred in the FSC
area.
    Finally, we agree with the district court that SAIC's
reliance on Engineer Ruiz's future testimony at trial is
insufficient to defeat summary judgment as to the issue of
proximate causation.  It is an established rule of law that
"establishing a genuine issue of material fact requires more than
effusive rhetoric and optimistic surmise."  Cadle Company v. Hayes,
116 F.3d 957, 960 (1st Cir. 1997).  Neither "unsupported
speculation, nor brash conjecture coupled with earnest hope that
something concrete will materialize" is sufficient to block summary
judgment.  Euromotion, Inc. v. BMW of North America, Inc., 136 F.3d
866, 869 (1st Cir. 1998) (quoting J.Geils Band Employee Benefit
Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir.
1991)) (internal quotations and citations omitted).  We conclude
that SAIC has failed to present any "genuine" evidence that water
ponding due to inherent structural or construction defects
proximately caused the damage to the FSC property.  We point out
that although there is evidence in the record that DT beams in the
FSC roof had deflected prior to Hugo, FSC need not prove that wind
was the sole cause of the damage to its property in order to
prevail on summary judgment.  See supra, at 27-31.  "In order to
recover [under windstorm insurance coverage] it is not necessary
that windstorm be the sole cause of the damage . . . . If the
damage would not have occurred in the absence of a windstorm, the
loss is covered by the policy."  Milan v. Providence Washington
Ins. Co., 227 F. Supp. at 253.  Because FSC has presented unrefuted
evidence that the damage to its property would not have occurred
but for Hurricane Hugo, we affirm the district court's entry of
summary judgment on the issue of liability in its favor.
         2.  The Coinsurance Penalty
    SAIC next argues that the district court erred in
granting summary judgment in favor of FSC on the issue of the co-
insurance penalty.  The insurance policy contains a coinsurance
clause which provides that:  
                   [t]he Company shall not be liable for a
                   greater proportion of any loss to property
                   covered than the limit of liability under this
                   policy for such property bears to the amount
                   produced by multiplying the actual cash value
                   of such property at the time of the loss by
                   the coinsurance percentage stated in the
                   Declarations.
                    
         (J.A. at 2769).  SAIC maintains that the FSC property is worth more
than the amount declared in the policy.  As a result, SAIC claims
that, if liable, it is only obligated to pay that proportion of the
damages equal to the proportion of the declared value to the actual
value pursuant to the terms of the coinsurance clause.   
    Another pertinent endorsement excludes from coverage
"[p]roperty which is more specifically covered in whole or in part
by this or any other contract of insurance, except for the amount
of loss which is in excess of the amount due from such more
specific insurance."  (J.A. at 2777).  FSC proffers the lease
agreements between FSC and its Building I and Building II tenants,
which provide that the tenants would purchase their own insurance
to cover all leasehold improvements, to prove that SAIC only
insured the structure of the buildings -- not the leasehold
improvements.  As a result, FSC argues that the declared value of
the property is in fact equal to the actual value of the insured
structure and thus the coinsurance clause is inapplicable.   
    In further support of this contention, FSC points to the
Pretrial Report, submitted by both parties in December 1993, which
includes as an undisputed fact the following information:
                   Under the terms of the leases, tenants in the
                   L-shaped building (Building "1") are
                   responsible for the integrity and maintenance
                   of their own leasehold improvements and
                   insurance therefor.  The policy does not cover
                   property not owned by the landlord . . .
                   including leasehold improvements made by
                   Tenants . . . . Tenants are required to
                   maintain their own insurance, and all damage
                   to leasehold improvements . . . are for the
                   account and responsibility of the respective
                   tenants.  The tenants have their own insurance
                   policies covering their leasehold
                   improvements.  The lease for the Firestone
                   Store (Building "2") contains similar
                   provisions.  The Kentucky Fried Chicken
                   building (Building "3") had a different lease,
                   according to which the Landlord provided, paid
                   for, and owned what would otherwise have been
                   the tenant leasehold improvements (i.e. a
                   "turnkey" location), and the Landlord insured
                   them.  Since the plaintiff herein owned the
                   leasehold improvements, the valuation limits
                   under the Policy reflected a higher per-unit
                   insurable value for Building "3".   
          
(J.A. at 64).

    Despite this earlier admission, SAIC now contends that
Buildings I and II should now be appraised to include the value of
the leasehold improvements, thus triggering the coinsurance penalty
clause.  We agree with the district court that by agreeing to the  
preceding "undisputed facts" in the Pretrial Report, SAIC has
waived this argument.  See Correa v. Hospital San Francisco, 69
F.3d 1184, 1195 (1st Cir. 1995).  We further agree that, even
absent waiver, SAIC has failed to conclusively rebut the evidence
proffered by FSC.  As a result, we conclude that FSC is entitled to  
judgment as a matter of law that the coinsurance penalty clause
does not apply to reduce SAIC's liability under the terms of the
policy.
         3.  The Emergency Repairs Setoff Issue
    SAIC next appeals the district court's grant of summary
judgment in favor of FSC with respect to its right to set off
amounts spent by Pueblo Supermarkets for repairs against the
$150,000 advanced by SAIC for emergency repairs immediately after
the hurricane.  SAIC objects to this ruling on the ground that the
Pueblo setoff is essentially a new claim, and that for this claim
to proceed, FSC should be required to request leave to file an
amended complaint.  Absent such a request, SAIC maintains that the
district court "flagrantly deviated from the mandates provided by
the Federal Rules of Civil Procedure" by accommodating FSC's
attempt at "ambush litigation."  (Appellant's Br. at 45).   
    It is undisputed that SAIC advanced FSC the sum of
$150,000 for emergency repairs.  After reviewing FSC's receipts,
the special master found that FSC used the amount of $104,199.11 to
conduct emergency repairs on Building I.  The special master also
found that some of this money had been inappropriately used to pay
FSC's  accountants.  Accordingly, the special master subtracted
this amount ($9,685) from the amount used for repairs.  The master
concluded that FSC appropriately spent $94,514.11 of the $150,000
in emergency repairs.  Thus, FSC owed SAIC $50,485.89 plus compound
interest of 5% per annum, amounting to a total of $71,083.72.
    On May 7, 1997, FSC, for the first time, submitted
receipts evidencing additional temporary repairs made by Pueblo.  
According to the documentation, Pueblo spent $146,000 on emergency
repairs immediately after Hugo.  It is undisputed that FSC
reimbursed Pueblo for these expenditures in the form of rent
concessions.  FSC argued that since the $146,000 was spent by
Pueblo on Fajardo's behalf, it was entitled to offset (or set off)
this amount against the $150,000 advance pursuant to Article 1149
of the Puerto Rico Civil Code.  To support this claim, FSC points
out that setoff is appropriate in this case because it arises from
the same breach of contract claim that is the subject of this
litigation.  Further, FSC maintains that SAIC has actually
benefitted from Pueblo's expenditures because by undertaking the
repairs on its own, Pueblo substantially reduced its claim for
business interruption.  Thus, FSC argues, if the setoff is not
allowed, SAIC will receive unjust enrichment.  
    At the May 7 hearing in chambers, the district judge
admonished FSC for the tardiness of its setoff claim.  However, the
judge ultimately allowed FSC's setoff claim to proceed.  The
grounds for the district judge's ultimate decision to allow the
setoff claim are unclear.  FSC never filed a motion for leave to
amend the complaint.  Nor was any amendment made.  Nevertheless,
FSC submitted the claim in a supplemental motion for summary
judgment filed on September 30, 1997.
    In ruling on this motion, the district judge specifically
found that FSC had established the requisites for compensation as
set forth in Article 1150.  We agree with the district court that  
FSC has established the requisites for a setoff under Puerto Rico
law.  We further conclude that no leave to file an amended
complaint was required for FSC to state its setoff claim.  As the
district court correctly noted, setoffs have no purpose other than
to "[allow] the convenient simplification of relations between
mutually indebted parties."  999 F. Supp. at 230-31 (quoting United
Structures of Am., Inc. v. G.R.G. Eng'g, S.E., 9 F.3d 996, 1000
(1st Cir. 1993)).  As such, FSC's setoff "claim" is not really a
separate claim at all from its original claim for an accounting and
determination of the amount of SAIC's liability.  As FSC correctly
points out, the accounting for the $150,000 advanced by SAIC was in
issue from the inception of the case.  Moreover, although the
proffer of Pueblo's receipts was tardy, the district court
specifically concluded that SAIC was not prejudiced by the delay.  
In sum, we agree with the district court that SAIC presented
insufficient evidence to rebut FSC's claim that it was entitled, as
a matter of law, to entry of judgment in its favor on the setoff
claim.
         4.  Business Interruption/Lost Rents
    The pertinent policy endorsement states that coverage is
extended to insure against "loss of rents caused by the perils
insured against damaging or destroying, during the policy period,
real or personal property at the premises described in this
endorsement."  (J.A. at 2765).  FSC originally claimed business
interruption damages in the amount of $77,109.37 based on an expert
report rendered by the accounting firm of Vlez, Semprit, Nieves &
Co.  However, the special master, in his first Report and
Recommendation, concluded that FSC misused $50,485.89 of the
$150,000 in emergency repair funds advanced by SAIC.  Specifically,
the special master found that the $50,485.89 misused by FSC could
have been used to repair Buildings II and III.  The special master
thus recommended that the district court not allocate any amounts
for business interruption as to these buildings.  As a result, FSC
reduced the amount of its business interruption damages claim by
$50,485.89 to $26,943.37.
    In its opposition to FSC's motion for summary judgment on
the issue of lost rent, SAIC maintains that FSC's claims are
"grossly exaggerated" and that "it does not take a genius to know
that a reduction in volume of sales in the Fajardo area after
Hurricane Hugo was expected due to the devastation of the hurricane
in the immediate area."  (J.A. at 346).  The weakness in SAIC's
argument, however, lies in the fact that it does not offer any
evidence to support these conclusory statements.  SAIC's opposition
relies on statements like "the evidence will show" and "the
evidence will further show."  (Id. at 344, 349)(emphasis added).  
Unfortunately for SAIC, at the summary judgment stage, it bears the
burden of actually presenting this evidence; it cannot rely on
"brash conjecture coupled with earnest hope that something concrete
will materialize" and expect to survive a motion for summary
judgment.  Euromotion, 136 F.3d at 869 (quoting J.Geils Band, 76
F.3d at 1251) (internal quotations and citations omitted).  We
agree with the district court that SAIC failed to meet its burden
of proof in order to defeat FSC's motion for summary judgment on
the issue of business interruption/lost rent damages.  We thus
affirm the district court's award of $26,943.37 in damages to FSC
for lost rent and business interruption.
         5.  Obstinacy
    SAIC's final complaint centers around the district
court's award of prejudgment interest in the amount of $868,826.60
plus attorneys' fees, based on its finding that SAIC displayed
obstinacy throughout the proceedings below.  FSC requested an award
of prejudgment interest and attorneys' fees pursuant to Rules
44.1(d) and 44.3(b) of the Puerto Rico Rules of Civil Procedure.  
Rule 44.1(d) states: "In the event any party or its lawyer has
acted obstinately or frivolously, the court shall, in its judgment,
impose on such person the payment of a sum for attorneys' fees
which the court decides corresponds to such conduct."  (Emphasis
added).  Similarly, Rule 44.3(b) states: " . . . . the court willalso impose on the party that has acted rashly the payment of
interest at the rate fixed by the Board . . . ."  (Emphasis added).  
    In a diversity case in which the substantive law of
Puerto Rico supplies the basis of decision, a federal court must
give effect to Rules 44.1(d) and 44.3(b) of the Puerto Rico Rules
of Civil Procedure.  See Dopp v. Pritzker, 38 F.3d 1239, 1252 (1st
Cir. 1994) (quotations omitted).  Moreover, because these rules
speak in imperatives, the imposition of attorneys' fees and
prejudgment interest is obligatory once the district court makes a
threshold finding that a party has acted with obstinacy.  See id.  
We review the district court's threshold determination of obstinacy
for abuse of discretion.  See id. at 1253.
    To make a threshold determination of obstinacy, a court
must "determine a litigant to have been unreasonably adamant or
stubbornly litigious, beyond the acceptable demands of the
litigation, thereby wasting time and causing the court and the
other litigants unnecessary expense and delay."  De Len Lpez v.
Corporacin Insular de Seguros, 931 F.2d 116, 126 (1st Cir. 1991).  
Puerto Rico courts have previously imposed obstinacy-based
attorneys' fees on insurance companies that unreasonably refuse to
settle out of court claims.  See, e.g., Morales v. Automatic
Vending Service, Inc., 103 D.P.R. 281 (1975).   
    In the instant case, the district court found that SAIC
was "unreasonably adamant" and "stubbornly litigious" by refusing
to settle this claim for over three years, while the property's
losses increased and FSC was forced to hire more experts and incur
mounting expenses.  See 999 F. Supp. at 233.  The district court
further concluded with respect to SAIC's obstinacy that "the record
speaks for itself."  Id. at 234.  After examining the record, we
conclude that the district court did not abuse its discretion in
making the threshold determination of obstinacy and thus affirm its
grant of prejudgment interest and attorneys' fees to FSC.
    The record reveals that SAIC's only settlement offers
have been unreasonable in that they have only covered a fraction of
the damages proposed by plaintiff.  See supra, at 6-7, 12.  In
addition, after opposing FSC's motion for a jury trial and agreeing
to the appointment of a special master, SAIC proceeded to object to
every report rendered by the master and refused to cooperate with
him throughout the proceedings.  It is important to note that
SAIC's substantive objections to the role of the special master,
discussed supra, at 17-26, do not provide the basis for our
affirmance of the district court's finding of obstinacy.  Rather,
we conclude that the district court's finding of obstinacy is
adequately supported by: (1) SAIC's original failure to timely
submit names of candidates for appointment as special master in
accordance with the court's order; (2) its subsequent barrage of
unwarranted allegations regarding the ultimate appointee's "lack of
objectivity, neutrality and clear bias in favor of the plaintiff"
(J.A. at 268); (3) its unsubstantiated allegations that the special
master's findings were "nothing more than speculation"  (Id. at
273); (4) its uncalled for allegations that "as a matter of fact
. . . [Special Master Murati] was not qualified to make most of the
recommendations contained in the report" (Id. at 343); and (5) its
adamant refusal to participate in the discovery process conducted
by the special master.  SAIC's refusal to cooperate forced the
special master to revise his report and recommendation three times,
further increasing the costs of this litigation.  SAIC's personal
attacks on Murati caused him to suspend his duties and file a
separate motion in defense of his work.  In sum, all of these
actions by SAIC wasted considerable time and caused the court and
FSC unnecessary expense and delay.  Based on our review of the
record, we thus conclude that the district judge acted within his
discretion in awarding prejudgment interest and attorneys' fees to
FSC based on a finding of obstinacy.
IV.  CONCLUSION
    For the reasons detailed in this opinion, we affirm the
district court's grant of summary judgment in favor of FSC.  We
also affirm the court's grant of prejudgment interest and
attorneys' fees.  Costs to be awarded to appellees.

</body>

</html>